AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

**FILED**
At Albuquerque NM

FEB 0 1 2013

MATTHEW J. DYKMAN
CLERK

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| In the Matter of the Seizure of | ) | |
|---|---|---|
| *(Briefly describe the property to be seized)* | ) | |
| The proceeds, contents and any U.S. Currency | ) | Case No.  13-MR-73 |
| contained in Bank of America acct 586026776081 | ) | |
| with final beneficiary A. Okojie & I. Ukpetenan | ) | |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ___United States___ District of
___New Mexico___ is subject to forfeiture to the United States of America under ___ U.S.C. §
___See Below___ *(describe the property)*:

18.U.S.C. 1343, 18 U.S.C. 1956, 18 U.S.C. 1957, 18 U.S.C. 982 (a)(1), 18 U.S.C. 982 (a)(2), 18 U.S.C. 981 (a)(1)(C),
18 U.S.C. 981 (a)(1)(D), 18 U.S.C. 981 (a)(1)(A), 28 U.S.C. 2461

Bank of America account number 586026776081

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

_____
*Applicant's signature*

Eric Laurin, Special Agent, U.S. Secret Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 2/1/13

_____
*Judge's signature*

City and state: ALBUQUERQUE, NEW MEXICO

Alan C. Torgerson
U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

### Background

1.      I am a Special Agent with the United States Secret Service (USSS), and have been so employed since September, 2007. As a Special Agent, I have received training at the Federal Law Enforcement Training Center, and graduated from the Special Agent Training Class at the USSS Academy.  My duties and responsibilities include investigations into possible violations of federal criminal laws of Title 18 (Money Laundering, Wire Fraud, and other Federal Violations).

2.      In my capacity as a Special Agent, I have conducted and participated in many financial crime investigations, written multiple affidavits in support of search warrants, and participated in the execution of search and seizure warrants.

3.      In the course of my employment with the USSS, I have conducted or been involved in numerous investigations of alleged criminal violations, which have included:  Wire Fraud (18 U.S.C. § 1343), Money Laundering (18 U.S.C. §§ 1956 and 1957), and Forfeiture (18 U.S.C. §§ 981 and 982).

4.      Through my training and experience, I am familiar with the methods and practices used by individuals and organizations involved in financial crimes and illicit activities that



generate large amounts of income.  The methods to generate and hide large amounts of income include, among others:

      a. To generate large amounts of income, individuals involved in financial crime will solicit individuals to wire large amounts of money through fraudulent online schemes.  The themes of these schemes include: online romantic relationships, business ventures, false inheritance, and lottery winnings.

      b. Individuals involved in financial crime will place assets in names other than their own or rely on third parties to conduct financial transactions for them to avoid detection of these assets by government agencies;

      c. Attempting to conceal the source and legitimize the profits from illegal activity by using domestic banks and their attendant services (i.e., safe deposit boxes, securities, cashier's checks, money drafts, electronic wire transfers, letters of credit, brokerage houses, real estate, shell corporations and business fronts).

5.    Unless stated otherwise, I have personal knowledge of the matters set out in this affidavit.  To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me through my own review of the



documents discussed in this affidavit and through reliable sources.

6.    Because this affidavit is made solely to seize a bank account pursuant to 18 U.S.C. § 981 and § 982, I have not included every fact known to me about this investigation.

7.    I make this affidavit in support of a warrant to seize the proceeds and contents from each of the following Bank of America accounts that is being used to transfer, conceal, and disguise proceeds derived from wire fraud and/or money laundering, pursuant to 18 U.S.C. § 981 and 18 U.S.C. § 982:

> All funds and monies credited to Bank of America account #355003638166 held by Bank of America, bearing Final Beneficiary Name **Anita Roberson**

> All funds and monies credited to Bank of America account #586026776081 held by Bank of America, bearing Final Beneficiary Names **Ann Okojie and Ibhade Ukpetenan**

> All funds and monies credited to Bank of America account #586026773424 held by Bank of America, bearing Final Beneficiary Name **Ann Okojie**

> All funds and monies credited to Bank of America account #586026773686 held by Bank of America, bearing Final Beneficiary Names **Ann Okojie and Ibhade Ukpetenan**

> All funds and monies credited to Bank of America account #586024877063 held by Bank of America, bearing Final Beneficiary Name **Ann Okojie**

8.    I further make this affidavit in support of a warrant pursuant to 18 U.S.C. §§ 981 and 982, and 28 U.S.C. § 2461 (Mode of Recovery), directing Bank of America to freeze the contents of each account in place and to refuse the withdrawal of any



amount from the account by anyone other than the USSS and while any contents of the account are frozen in place to accrue deposits, interest, and dividends, until the USSS directs that the contents of each account be finally liquidated and no contents remain (for no longer than a period of 30 days). Freezing the contents may be appropriate in the event the bank is unable to provide the funds immediately to the Federal Agents and therefore restricts the removal and/or dissipation of the funds by the account holder(s).

### FACTS SUPPORTING PROBABLE CAUSE

9.     On December 20, 2012, Mary Montes came to the Unites States Secret Service (USSS) Albuquerque Resident Office and met with USSS SA Eric Laurin to report she was the victim of a fraudulent scheme that resulted in her making multiple overseas wire transfers to an individual who claimed to be in the United Kingdom.  These wire transfers totaled approximately $3,312.33. Montes also made two bank deposits into a Bank of America account based out of Washington State totaling approximately $10,200.  The total amount of both wire transfer and bank deposits Montes made between November 3, 2012 and December 10, 2012 was approximately $13,312.33.

10.    According to Montes, she created a profile on the dating website ChristianMingle.com around the middle of October, 2012. Almost immediately she was contacted by an individual whose

profile identified him as Jeff Alexander.  Alexander told Montes
that he was born in Australia but resided in New York.  He
claimed to be a crude oil broker and said his job required him
to travel all over the world.  In fact, at the time he made
contact with Montes, Alexander reported he was in Scotland on
business.

11.    The two initially communicated through the
ChristianMingle.com website but soon began online chatting
through Yahoo.com's instant messaging service and email.

12.    A week after Alexander first contacted Montes he told her
he was back in New York applying for a business loan to buy
crude oil from Saudi Arabia.  On October 30th, 2012, Alexander
told Montes he was in Saudi Arabia making his oil purchase and
planning to ship the oil to the United Kingdom.

13.    On November 2, 2012, Alexander called Montes on her
cellular phone and said he made it to London with the oil.
Montes provided the number Alexander called her from as
442032868086.  A subsequent search relating to this phone number
format revealed that the numbers "44" represent the country code
for the United Kingdom.

14.    Montes advised SA Laurin that on at least one occasion
leading up to the above conversation, she used the video chat
services available through the Yahoo.com instant messaging
service while she was speaking with Alexander.  Montes stated



that at first Alexander would not turn on his camera and show his face.  She told him that bothered her since she was allowing him to see her.  Alexander was reluctant and stated that it was against his company policy to video chat.  He finally relented and told Montes he would turn on his camera.  It was another 40 minutes before he finally turned it on however.  When he did, Montes said it was obvious that Alexander had cut out a picture of a man and was holding it in front of the camera.  Montes said she knew this was the case because the eyes never blinked and the face never moved while they carrying out their conversation.

15.    Montes said that Alexander previously posted a picture of himself on his ChristianMingle.com profile page.  In that photo, he appeared to be a Caucasian male in his late thirties or early forties.  The photo that Alexander held up in front of the camera while they were chatting appeared to be of the same individual.  Montes thought Alexander's actions were odd, but she was becoming emotionally invested in the relationship so she overlooked it.

16.    On November 3, 2012, Alexander once again called Montes. This time he was in a panic because, he claimed, the British customs agency had seized his crude oil and was demanding a £13,000 payment to release it.  He said he only had £10,000 and needed the additional £3,000 (Approximately $4,847 US) or he would lose his crude oil.  Montes said she didn't have that kind

of money.  Alexander began to cry and beg her for help.
Alexander became verbally aggressive and told her he didn't even
have a hotel room for the night.  He said it was going to be her
fault if he had to sleep on the streets that night.  Montes
finally gave in and said she could wire Alexander $300 to at
least pay for his hotel room that night. Montes provided SA
Laurin with a copy of the receipt showing the $300 wire to the
United Kingdom on November 3, 2012.

17.     Over the next couple of days Alexander continued to call
or text Montes asking for more money.  He told her his deal
would fall apart if he didn't come up with the money he needed
in a week.  He told Montes that he was set to receive a check
for £300,000 (Approximately $484,000 US) and he would pay her
back whatever she loaned him.

18.     Alexander told Montes that if she could come up with more
money he wanted her to deposit into an account belonging to a
woman named Cheryl Nelson whom he stated was his accountant.
Alexander told Montes that Nelson lived in Washington State but
she worked at the port in London.  He provided Montes with the
routing and account number for Nelson's Bank of America account
based out of Washington State (Routing #125000024/Account
#95379459) and told her to go to a Bank of America branch in
Albuquerque to deposit the money.

19.     On November 5, 2012, Montes went to the Bank of America

branch located at 3101 Carlisle Blvd NE, Albuquerque, NM and deposited $2,200 into the account Alexander provided for Cheryl Nelson, account #95379459. Montes provided SA Laurin with a copy of the deposit slip documenting the above transaction.

20.     On November 8, 2012, Montes received an email from an individual claiming to be Alexander's lawyer, who identified himself as Esq. Manuel Macini. Montes provided SA Laurin with a copy of the email. It read verbatim as follows:

> "Hello Madam,
> This is Jeff Attorney from England Jeff has been arrested
> at the Bank for a huge sum of his contract he transferred
> to the US he give me your email address and ask me to send
> you a note to tell you never to worry that he is going to
> be fine please read and I hope this gives you a better
> understanding.
> Write back to me Madam
> Esq. Manuel Macini"

21.     Montes responded to Macini and he told her that Alexander was arrested when he went to deposit the £385,000 check he received for his crude oil deal. Macini emailed Montes a copy of a document indicating it was from the "European Union Anti-Terrorist Agency (EUATA)". The letter, dated November 8, 2012, detailed that Alexander was arrested because he was not authorized to cash the £385,000 check and that a fee of £13,000 was due to correct this situation.

22.     SA Laurin performed an internet search for the European Union Anti-Terrorist Agency and found no records for such an agency. The letter documented a purported violation of "Article



13, Section 38, subsection IV of the 2002 financial and allied matters Act 1". SA Laurin performed an internet search for records relating to the above act and found the closest reference to be the "Companies and Allied Matters Act" passed by the Nigerian government.

23.     After receiving the above information, Montes was distraught and worried for Alexander. As a direct result, she made three more wire transfers to Alexander in the United Kingdom. On November 11, 2012 she wired a total of $434. On November 17, 2012 she wired a total of $330.68. On another day in November she wired an additional $435.97. Montes provided SA Laurin with copies of receipts for the above transactions. The date on the receipt for the final transaction had been torn off, but Montes confirmed she completed the transaction in November after she was told of Alexander's arrest.

24.     In addition to the above wire transfers, Montes also reported that she took out loans against her mortgage, pay day loans, and a personal loan from her aunt to come up with an additional $8,000 for Alexander.

25.     On November 14, 2012, Montes went to the Bank of America branch located at 6645 Caminito Coors NW, Albuquerque, NM, and deposited the $8,000 documented above into the Bank of America account belonging to Cheryl Nelson, account #95379459. She provided SA Laurin with a copy of the deposit receipt

documenting the above transaction.

26.     Alexander continued to string Montes along by playing on her generosity and telling her that he anticipated his check clearing soon.  For her part, Montes felt that she had given so much money that she should ride it out and see if he would pay her back.

27.     Over the next couple of weeks, Alexander continued to tell Montes that he was waiting for his check to clear.  In early December, 2012, Alexander called Montes and was very upset.  This time he said the British government put a stop payment on his check because his license to sell crude oil had expired.  As a result he claimed the government fined him £30,000 (approximately $48,480 US).  Montes told him she had no more money to give.

28.     Finally, on December 10, 2012, Alexander called Montes and again asked her for money.  He claimed he had raised almost all of the money he needed to pay his fine and just needed a little more.  Montes borrowed $1,600 from a relative and completed two final wire transfers.  The first for $866.34 and the second for $916.34.  She provided SA Laurin with copies of the Western Union receipts documenting the above wire transactions.  That was the last time she communicated with Alexander.  In the following days, Montes called the phone number Alexander had been using, but it was no longer in



service.  She also found that his ChristianMingle.com profile had been removed from the website.

29.    On December 20, 2012, SA Laurin called Bank of America's law enforcement assistance line (1-800-900-9044) and spoke to a representative regarding account #95379459 into which Montes deposited money.  The representative confirmed that the account was still active and was opened in the name of Cheryl Nelson. The Bank of America representative also confirmed that the account was based out of Washington State.  Based on SA Laurin's phone conversation with the Bank of America representative and their own examination of account activity, Bank of America administratively froze account #95379459 and opened their own internal case for assignment to a Bank of America investigator.

30.    On December 26, 2012, SA Laurin spoke to the Bank of America fraud investigator assigned to this case.  The investigator reported that account #95379459 was originally opened by Cheryl Nelson in 1984 and showed a low balance and relatively little activity until November of 2012.  Preliminary investigation revealed that between November 1, 2012 and December 21, 2012 account #95379459 had approximately $80,000 of incoming domestic and overseas deposits and wire transfers followed by almost the same amount in outgoing domestic and overseas wire transfers.  He specifically pointed out that on November 15, 2012, one day after Mary Montes deposited $8,000



into account #95379459, Cheryl Nelson went into a Bank of America branch location in Seattle, Washington and sent an approximately $7,500 wire transfer overseas out of account #95379459.  On November 16th, 2012, account #95379459 received an incoming wire transfer from overseas of approximately $7,900. Over the next couple of days, it appeared Nelson wired money from account #95379459 to multiple U.S.-based Bank of America accounts in Missouri and Texas, discussed below.

31.  According to bank records the account based out of Missouri (Account #355003638166) was opened in early December, 2012 and belonged to an individual identified as Anita Roberson who listed that she was "unemployed" on her account application.

32.  On December 11, 2012, Nelson wired $8,000 from account #95379459 into Roberson's account #355003638166 and an additional $5,000 on December 18, 2012.  Following the above transactions, Roberson withdrew from account #355003638166 a total of $6,700 in cash (it was subsequently determined that Roberson wired this money to Nigeria via Western Union) and also initiated a bank-to-bank wire transfer of $6,200 directly to Nigeria.

33.  There were a total of four accounts based out of Texas belonging to two individuals identified as Ann Okojie and Ibhade Ukpetenan:  accounts #586026776081 (joint account), #586026773424 (Okojie's account), #586026773686 (joint account),

and #586024877063 (Okojie's account).

34.  The Bank of America investigator stated that the accounts were opened in Texas in 2011 however the address associated with these accounts was listed as being in Lagos, Nigeria and their banking activity indicated they currently live in Ohio even though the bank has no Ohio address on file.

35.  On December 5, 2012, Nelson wired $3,000 from account #95379459 into a joint checking account belonging to both Okojie and Ukpetenan (#58602776081).

36.  On December 10, 2012, Nelson wired an additional $2,000 from account #95379459 into the same account.  The account balance prior to the incoming wire transfers from Nelson was only $316.92.

37.  Okojie and Ukpetenan subsequently split up the above proceeds and transferred them into three additional accounts that were either individually or jointly controlled by them, accounts #586026773424, #586026773686, and #586024877063.

38.  For example, on December 7, 2012, two days after Nelson wired $3,000 from account #95379459 into Okojie/Ukpetenan account #58602776081, $2,000 was transferred into Okojie checking account #586026773424.  On the same day an additional $600 was transferred into Okojie/Ukpetenan joint checking account #586026773686.

39.  On December 11, 2012, one day after Nelson wired $2,000



from account #95379459 into Okojie/Ukpetenan account
#58602776081, $1,200 was transferred into Okojie savings account
#586024877063).

40.   The account balance for Okojie/Ukpetenan account
#58602776081 was only $155.19 after the above transfers were
completed.   According to the Bank of America investigator, it
appeared that Okojie and Ukpetenan used some of the funds
provided by Nelson for personal expenses.   The rest remained in
all four of the Okojie/Ukpetenan accounts.

41.   On December 27, 2012, SA Laurin obtained a federal seizure
warrant to seize the funds in Cheryl Nelson's account #95379459.

42.   On December 28, 2012, SA Laurin contacted Cheryl Nelson by
phone regarding this case.   Nelson stated that, just like Mary
Montes, she met a man through the online dating website
ChristianMingle.com.   He identified himself as "Manuel Macini"
(the name that Mary Montes understood was Jeff Alexander's
attorney) and said he worked in the oil business.   Macini told
Nelson that he was a U.S. Citizen but traveled abroad constantly
for work.   They communicated through text and email.   At some
point, Macini told Nelson that his son had been seriously
injured while on a field trip to Lagos, Nigeria.   He asked
Nelson to send him some money to help pay his son's medical
bills.   Nelson told Macini that she was not financially able to
give him money.   Macini then told her that she could still help



by allowing him to have friends send money to her account which she could then send on to him via wire transfer. Nelson agreed to help and provided Macini with her Bank of America account information for her account #95379459. Nelson advised that she subsequently received multiple deposits from various individuals throughout the U.S. whom Macini claimed were either family or friends. For instance, Macini told Nelson that Mary Montes was a friend of his mother.

43. Nelson followed Macini's instructions regarding wiring money to Nigeria. SA Laurin asked Nelson about the money that she wired to the two U.S.-based accounts. She stated that Macini told her to send the money to the accounts he provided, and those individuals would forward the funds to him in Nigeria to pay his son's medical bills.

44. On January 2, 2013, SA Laurin contacted Anita Roberson by phone. Roberson told SA Laurin that in early November, 2012 she met a man through the online dating website ChristianMingle.com. He identified himself as Jeff Alexander. Alexander told Roberson that he owned his own oil business and was currently working on an oil rig off the coast of Scotland. At one point Roberson stated that she had a video chat with Alexander however all she could see was a man sitting at a desk who appeared to be talking on the phone. She couldn't actually hear Alexander speaking. After only a couple of minutes, Alexander turned the



camera function off and began speaking again.  He claimed he couldn't get the microphone and camera to work at the same time. Roberson said the man she saw on camera for that brief period of time appeared to be the same individual in the photos that Alexander sent her previously via email.  She subsequently sent those images to SA Laurin.  SA Laurin confirmed the photo's she provided were of the same man that Mary Montes knew as Jeff Alexander.

45.  Alexander told Roberson that his son was on a field trip to Lagos, Nigeria and was somehow injured.  He stated he needed money to help pay medical bills.  Roberson initially sent him $900 of her own money but was financially unable to send more. Alexander then asked Roberson to open a Bank of America account which she did (Account #355003638166).  She was told that Cheryl Nelson was a friend of Alexander's mother and that Nelson would be sending Roberson money that he wanted Roberson to then wire to him in Nigeria.

46.  SA Laurin asked Roberson if she was still in contact with Alexander.  She advised that she was.  He already told her that Cheryl Nelson was having "trouble" with her account which was consistent with the fact that Bank of America was holding the funds pending an internal bank investigation.  SA Laurin asked Roberson if she would be willing to assist with this investigation and continue to speak with Alexander. She agreed



to do so.

47.  On January 3, 2013, SA Laurin executed the federal seizure warrant for Cheryl Nelson's account #95379459 at the Bank of America branch located at 303 Roma Avenue NW, Albuquerque, NM. Bank of America issued SA Laurin a cashier's check in the amount of $15,754.54 made payable to the U.S. Secret Service.

48.  On January 3, 2013, Anita Roberson contacted SA Laurin by email and advised that Alexander emailed her requesting that she send $200 to him in Nigeria.  Roberson subsequently told Alexander that she couldn't come up with that kind of money but stated she would still be willing to allow him to have friends send money into her Bank of America account which she would then send on to him.  Alexander continued to use the story that the money was being used to pay medical bills for his son.

49.  On January 9, 2013, Roberson once again contacted SA Laurin.  She reported receiving a text from Alexander early that morning stating that one of Cheryl Nelson's "clients" would be wiring funds into Roberson's Bank of America account #355003638166.  Roberson provided SA Laurin with a transcript of the text from Alexander which stated verbatim as follows:

> "Cheryl just text to let me know she will be sending her
> client to send out some founds to your account since she is
> having problem with her bank."

50.  A subsequent text from Alexander stated verbatim as follows:



> "Oh that's cool baby once she send the $8200 you can use
> $200 for feeding while you send out the $8000 to me hope
> you still have the account Infos with you."

51.  A couple of hours later, Roberson called SA Laurin and

stated that Alexander contacted her by text and told her the

money was deposited into her account #355003638166.

52.  SA Laurin contacted the Bank of America investigator by

phone and requested that he check the status of account

#355003638166.  The investigator confirmed that $8,200 was wired

into Roberson's account #355003638166 from an unknown source in

Arizona.

53.  In the afternoon on January 9, 2013, Alexander contacted

Roberson via online instant messaging.  Roberson told Alexander

that when she went to the bank to withdraw the money from

account #355003638166, she was detained by bank investigators

and the Secret Service.  Alexander told her to call the bank and

tell them to send the funds back to the sender.  He told her

that he was going to contact Cheryl Nelson and tell her to have

her client contact the bank.

54.  On January 10, 2013, Alexander once again contacted

Roberson by text message.  He told her to go the bank and tell

them the person who sent her the money was "bothering" her and

needed her money back.  This would have been a lie since

Roberson had not been contacted by the sender.  Alexander also

instructed Roberson to tell the bank she was no longer



communicating with him.  This too would have been a lie. Roberson asked for the name of the individual who sent the money to her account #355003638166.  Alexander replied that the sender's name was Cathy Brooks.  He emailed Roberson what he stated was Cathy Brooks' banking information, identifying an account with Arizona State Credit Union in Scottsdale, Arizona.

55.  On January 10, 2013, SA Laurin contacted an investigator with Arizona State Credit Union.  The investigator confirmed that Catherine Brooks was the account holder on the account Alexander provided to Roberson.  He advised that a review of Brooks' recent account history revealed no large deposits or withdrawals including anything in the amount of $8,200.  It therefore did not appear that money from Brooks' personal account was used to make the deposit into Roberson's account #355003638166.  The investigator further stated that Brooks made no reports of fraud associated with her account.

56.  On January 23, 2013, SA Laurin once again contacted the Bank of America investigator by phone.  The investigator advised there was no additional activity on Roberson's account #355003638166 following the $8,200 deposit on January 9, 2013. He further stated that no one contacted the bank to request the funds be returned. In addition, he stated that he administratively closed all four of Okojie/Ukpetenan accounts (accounts #586026776081, #586026773424, #586026773686, and



#586024877063) as required by Bank of America policy.  He moved the money, totaling $2,497.71, into a general account belonging to Bank of America and advised it would be held there indefinitely.  Neither Okojie nor Ukpetenan contacted the bank to ask why their accounts were closed.

57.  Continuing on January 23, 2013, SA Laurin contacted the Arizona State Credit Union investigator.  He advised there was no additional suspicious activity relating to Catherine Brooks' account since January 10, 2013.  Additionally, Brooks did not contact the bank to report fraud associated with her account. The investigator agreed to call Brooks and provide her with SA Laurin's contact information.

58.  Continuing on January 23, 2013, SA Laurin received a phone call from Brooks regarding this case.  Brooks reported that in early December, 2012 she signed up for an account on the dating website ChristianMingle.com.  Within a few days she began communicating with an individual who identified himself as Jeff Alexander.  Alexander told Brooks he worked in the oil export business and had recently received a contract to ship oil from Saudi Arabia to England.  Within a couple of weeks, Alexander told her that his oil was seized by the authorities in England and he needed money to get it released.  Brooks sent Alexander approximately $2,900 via Western Union.

59.  Alexander continued to ask for more money to help him



secure the return of his oil.  Brooks was willing to help but because she didn't have a Bank of America account Alexander told her she would need to send any additional funds by another means.  He told Brooks that he met a U.S. citizen named Cheryl Nelson who worked at the hotel where he was staying in London. He told Brooks that Nelson had a friend named Anita Roberson who lived in Missouri and that Roberson had an account which allowed her to send international wire transfers.  Alexander provided Brooks with Roberson's account information (account #355003638166).  On January 9, 2013, Brooks took $8,200 of her own money, which she claimed she held in cash as an emergency fund, to a Bank of America branch in the Phoenix, AZ area, and deposited it into Roberson's account #355003638166.

60.  On January 10, 2013, Alexander told Brooks that the money she sent to Roberson had been put on a hold by the bank because they believed it was associated with fraudulent activity.  He requested Brooks' bank account information so he could send it to Roberson and have Roberson return the funds.  Brooks provided Alexander with her Arizona State Credit Union account identifiers.  In spite of the above, Alexander continued to press Brooks to come up with an additional $8,200 to send to him.

61.  On January 15, 2013, Brooks sent Alexander an additional $700 via Western Union which Alexander told Brooks he used to



pay for his hotel room.  On January 16, 2013, Brooks sent an additional $700 to help Alexander replace a cell phone.  On January 21, 2013, Brooks sent another $500 via Moneygram to purportedly help Alexander pay for a prescription.

62.  On January 22, 2013, Brooks booked a flight to London with every intention of meeting up with Alexander.  She cancelled the flight when Alexander became very upset and demanded that she not get on the plane.  He told her he had a dream that her plane was going to crash.

63.  It was at that point that Brooks finally realized that she had been scammed.

64.  The above activity is consistent with actions taken in a money laundering scheme.  Specifically, the wiring of funds through multiple accounts in order to disguise the source of the funds as being derived from criminal activity

## CONCLUSION

WHEREFORE, your affiant respectfully requests that pursuant to 18 U.S.C. § 982(a)(2), and 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, allowing criminal forfeiture of proceeds based on 18 U.S.C. 1343, and pursuant to 18 U.S.C. §§ 981(a)(1)(C) and (D), allowing civil forfeiture of proceeds based on 18 U.S.C. § 1343,

and/or pursuant to 18 U.S.C. § 982(a)(1), allowing criminal forfeiture of proceeds and facilitating property based on 18



U.S.C. §§ 1956 and 1957, and pursuant to 18 U.S.C. § 981(a)(1)(C) and 981(a)(1)(A), allowing civil forfeiture of proceeds and facilitating property based on 18 U.S.C. §§ 1956 and 1957,

based on the fact that the account contains fungible proceeds which are subject to rapid dissipation, it is hereby requested that Special Agents of the USSS be authorized:

**To effect the seizure of all funds and monies credited to:**

Bank of America account number 355003638166 bearing the Final Beneficiary Name Anita Roberson

Bank of America account #586026776081 bearing the Final Beneficiary Names Ann Okojie and Ibhade Ukpetenan

Bank of America account #586026773424 bearing Final Beneficiary Name Ann Okojie

Bank of America account #586026773686 bearing Final Beneficiary Names Ann Okojie and Ibhade Ukpetenan

Bank of America account #586024877063 bearing Final Beneficiary Name Ann Okojie

**To direct Bank of America to freeze these contents of each account in place;**

**To refuse the withdrawal of these funds from these Bank of America accounts by anyone other than USSS;**

**To continue to accrue deposits in each account, while the contents of each account are frozen in place, until USSS directs that these contents of each account be finally liquidated and no such contents remain; and/or**

**To liquidate some or all of the contents of each account at one or more times and upon liquidation of any contents to turn over the liquidated amount to USSS.**



Freezing these contents could occur in the event the financial institution is unable to provide the funds immediately to USSS, and therefore restricts the removal and/or dissipation of these funds by the account holder(s).

I swear that this information is true and correct to the best of my knowledge, information and belief.


Approved by AUSA Cynthia Weisman




Respectfully submitted,

_____

Eric Laurin
Special Agent, USSS
Albuquerque, New Mexico


SUBSCRIBED TO AND SWORN BEFORE ME ON THIS

_____ day of _____Feb._____, 2013

_____

UNITED STATES MAGISTRATE JUDGE